STATE of Utah, Plaintiff and Appellee,

v.

Michael DOPORTO, Defendant
and Appellant.

No. 940014.

Supreme Court of Utah.

Jan. 17, 1997.

Rehearing Denied March 24, 1997.

Jan Graham, Atty. Gen., Thomas Brunker, Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

Mary C. Corporon, Salt Lake City, for defendant and appellant.

STEWART, Associate Chief Justice:

On appeal, Michael Doporto contests, on the basis of numerous asserted errors in the trial court, his conviction for sodomy on a child. He was sentenced to a prison term of fifteen years to life. We hold that the trial court erred in admitting evidence of prior crimes, vacate the verdict, and remand for a new trial.

## I. FACTS

On March 17, 1993, the State charged Doporto with the crime of sodomy on a child, a first degree felony, in violation of Utah Code Ann. § 76–5–403.1. Doporto asserted that he was indigent and requested that the court appoint counsel for him. The court ruled that Doporto was not indigent and refused Doporto's request that counsel be provided at the State's expense. Thereafter, Doporto represented himself throughout the proceedings.

Doporto was charged with sodomizing A.W., a girl who was seven years old at the time of the alleged crime. Prior to trial, the State filed a motion in limine to allow six other persons to testify that Doporto also had sexually abused them on other occasions. Doporto objected to the admission of this testimony and renewed his objection at trial. The trial court ruled in a memorandum decision that under Rule 404(b) of the Utah Rules of Evidence,[1] the testimony of two of these persons was "too remote [in time] to be probative of any plan, scheme, design, opportunity, or claim of intent" and therefore was not admissible. The court held that the other incidents proffered by the State, however, were not too remote and also ruled that there were sufficient similarities between the other incidents and the crime for which Doporto had been charged to permit the testimony of the four remaining witnesses under Rule 404(b). The trial court then ruled that the probativeness of the proffered testimony of all four witnesses who would testify about five prior incidents was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading [of] the jury" but that "the testimony of any two (2) of the proffered witnesses would not be prejudicial[,] nor would they confuse or mislead the jury if they were admitted into evidence." Accordingly, the court allowed the State to select any two of the proffered witnesses and present their testimony.

During pretrial proceedings, Doporto informed the court that he had a partial hearing deficiency, and the court allowed Doporto's wife to sit next to him and assist him by repeating into his ear at close range what other persons in the courtroom were saying. At trial, the court provided Doporto with amplification headphones linked to the microphone systems in the courtroom and refused to allow his wife to sit with him as an "interpreter."

The victim, A.W., testified that sometime during the summer of 1988, when she was seven years old, she went to Doporto's home when one of Doporto's daughters invited her to sleep over. During the evening, Doporto entered the room, asked A.W. if she wanted

---

1. Rule 404 states:

> (a) **Character evidence generally.** Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
>
> (1) **Character of accused.** Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same;
>
> (2) **Character of victim.** Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim

offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

> (3) **Character of witness.** Evidence of the character of a witness, as provided in Rules 607, 608, and 609.
>
> (b) **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

some lotion, and then had her sit on the couch next to him, where he pulled her legs onto his lap, rubbed lotion on the inside of her legs, and touched her panties. Doporto then left the room but later returned and lay down behind her, pulled her nightgown up, and anally sodomized her. After Doporto left the room, A.W. attempted to wake Doporto's daughter, who was either asleep or pretending to be asleep and did not respond. A.W. cried herself to sleep. In the morning, A.W. gathered her things and left.

A.W.'s mother testified that A.W.'s behavior had changed at about the same time. She developed difficulties in school while in the second grade, said that she wanted to change her name and her appearance, and shied away from adults, particularly men. A.W.'s aunt testified that during the late summer of 1988, while on a visit, A.W. seemed uncomfortable disrobing in her aunt's presence prior to taking a bath and appeared to experience pain when she sat in the bathtub. Her aunt also noticed a dark stain in the crotch area of A.W.'s panties and initially assumed that A.W. was not wiping adequately after going to the bathroom. She then noticed, however, that the stain had no odor, and she threw the panties in the trash. There is no evidence in the trial transcript that she either notified A.W.'s parents about the stain or sought medical treatment on A.W.'s behalf.

The State also called a pediatrician, Dr. Edward Keith Madsen, and a clinical psychologist, Dr. Lynn Ravesten, as expert witnesses. Dr. Madsen testified that anal intercourse by an adult male on a seven-year-old girl could produce tearing and bleeding in the anus, but he also testified that similar tearing and bleeding in children is frequently caused by bowel movements. Dr. Ravesten testified concerning typical behavior patterns of victims of sexual abuse and described common personality changes. He stated that children will often wait several years to report incidents of abuse.

In addition, the State presented the testimony of the two witnesses it had selected pursuant to the court's order permitting evidence of Doporto's alleged prior sexual crimes. There is no evidence in the record

that Doporto was given any notice prior to the trial of who those witnesses would be. B.J.L. testified that in 1986, when she was eleven years old and a friend of one of Doporto's daughters, she had gone to Doporto's house. When she arrived, Doporto answered the door, informed her that his daughter was not home, and invited her to go driving with him. She testified that he took her to a remote location, removed her clothing, and had intercourse with her. B.J.L. stated that as they drove back into town, Doporto gave her a dollar, told her that what had happened was a secret, and that if she told her parents, they would not believe her and would send her away or they would be harmed in some way.

T.M., Doporto's niece, testified as to two prior incidents of abuse. In 1980, more than eight years prior to the charged crime and eleven years prior to trial, when T.M. was about five years old, she attended a family gathering. Doporto's wife informed T.M. that she should go with Doporto and that he would give her a bath. T.M. stated that when Doporto took her into the bathroom, he placed her in the bathtub, rubbed baby oil on her, and then had intercourse with her. Apparently arrangements had been made for her to stay the night. T.M. testified that Doporto raped her two more times during the course of the evening. At one point, T.M. stated that he showed her some dogs in the back yard and informed her that if she ever told anyone what had happened, the dogs would eat her.

T.M. also related another incident which occurred in 1989, when she was approximately fourteen years old. At another family gathering, Doporto came into the room where T.M. was watching television and told her he had money for her. He gave her five dollars, took her into a room, and unzipped her pants. He then attempted to kiss her, pulled down her underwear, and "stuck his fingers inside [her] vagina."

On appeal, Doporto asserts a number of errors. Because we find the erroneous admission of evidence of prior sexual abuse sufficient to warrant a new trial, we will address the other issues only to the extent

they may bear upon the proceedings at a new trial.

## II. STANDARD OF APPELLATE REVIEW WITH RESPECT TO ADMISSIBILITY OF EVIDENCE OF OTHER CRIMES

The admissibility of prior crime evidence in a criminal trial raises fundamental issues of fairness that also affect to some extent the standard of review that an appellate court should apply in reviewing a conviction based in part on such evidence.

■ Evidence of prior crimes may be admissible in the prosecution's case in chief for two purposes. First, the commission of prior crimes may, itself, constitute an element of the crime charged or bear on the sentence to be imposed, as in capital crimes and some crimes for which minimum mandatory sentences may be imposed. Second, evidence of prior crimes may be adduced as circumstantial evidence of a material element of the crime charged. The highly prejudicial effect of prior crime evidence has been recognized in both instances and dealt with in different ways.

The first category of prior crime evidence is admissible because the commission of a prior crime or crimes is an aggravating factor constituting an element of the crime charged and must be proved beyond a reasonable doubt for the prosecution to prove all the elements of that enhanced charge. We have held that the prior crime evidence must not be allowed to prejudice the finder of fact in deciding the issue of guilt on the underlying charge. To that end, we have required that the prior crime evidence be presented in a separate bifurcated proceeding, after the proceeding where guilt is decided on the underlying charge. We have so held in both capital, *State v. Bishop,* 753 P.2d 439, 498–99 (Utah 1988) (Zimmerman, J., concurring in the result); *id.* at 496 (Durham, J., concurring separately); *id.* at 489 (Stewart, J., concurring in part and concurring in the result), and noncapital cases, *State v. Wareham,* 772 P.2d 960, 963–65 (Utah 1989). We have also relied upon the same principle in requiring severance and separate trials for separate charges against a defendant that are reasonably severable. *E.g., State v. McCumber,* 622 P.2d 353, 356 (Utah 1980).

The second category, prior crime evidence as circumstantial evidence of an element of a crime charged, poses a particularly difficult problem for the integrity of the judicial process in its truth-finding function because neither bifurcation nor severance is a practicable alternative for avoiding the prejudicial effect of such evidence. It is nevertheless admissible under special circumstances.[2] *See State v. Johnson,* 748 P.2d 1069, 1074–75 (Utah 1987); *State v. Tanner,* 675 P.2d 539, 548 (Utah 1983). The decision whether such evidence should be admitted requires a sensitive balancing of the inherent prejudice of such evidence against the need for such evidence and its special and articulated probativeness of a material issue that is sufficient to override the prejudice so that the issue of guilt is decided rationally on the evidence rather than being inferred from the bad character of the defendant. The fundamental dilemma posed by the prejudicial nature of prior crime evidence and its logical (as opposed to legal) relevance has been stated by Dean Wigmore:

> It may almost be said that it is because of the indubitable relevancy of specific bad acts showing the character of the accused that such evidence is excluded. It is objectionable not because it has no appreciable probative value but because it has too much. The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited and either to allow it to bear too strongly on the present charge or to take the proof of it as justifying a condemnation, irrespective of the accused's guilt of the present charge.

1 *Wigmore on Evidence* § 58.2, at 1212 (Tillers rev. ed. 1983).

2. For a scholarly and useful overview of the permissible purposes and special circumstances for admitting prior crime evidence in child abuse cases, see John E.B. Myers, *Uncharged Misconduct Evidence in Child Abuse Litigation,* 1988 Utah L.Rev. 479.

■ The State argues that the correct standard of review in this case is the "abuse of discretion" standard, citing *State v. Pena*, 869 P.2d 932, 938 (Utah 1994), and *State v. Hamilton*, 827 P.2d 232, 239–40 (Utah 1992). Both cases broadly state that appellate courts, in reviewing trial court rulings on the admissibility of evidence, should accord broad discretion to the trial court. But while the rule of broad trial court discretion governs appellate review generally of many evidentiary rulings, that is certainly not always the case. In particular cases, the policies underlying the evidentiary issues require a stricter standard of review by appellate courts. *Pena*, 869 P.2d at 937–38.

■ We have not addressed the issue of scope of review of rulings on prior crime evidence since our decision in *Pena*. Suffice it to say that the current status of the case law with respect to appellate review of prior crime evidence is highly inconsistent, if not chaotic. Some Court of Appeals cases on the issue have stated that Rule 404(b) raises questions of law that are reviewed for correctness, with attendant factual findings evaluated for clear error. *State v. Olsen*, 869 P.2d 1004, 1009 (Utah.Ct.App.1994); *State v. O'Neil*, 848 P.2d 694, 698–99 (Utah.Ct.App. 1993); *State v. Taylor*, 818 P.2d 561, 568 (Utah.Ct.App.1991). Other cases have cited the traditional "abuse of discretion standard." *E.g.*, *State v. Jamison*, 767 P.2d 134, 137 (Utah.Ct.App.1989). Still other cases have stated that the trial court is accorded "broad discretion," *State v. Teuscher*, 883 P.2d 922, 926 (Utah.Ct.App.1994), or a "good deal of discretion." *State v. Squire*, 888 P.2d 1102, 1103 (Utah.Ct.App.1994). Our own

cases have also vacillated from a sub silentio de novo review standard, *see State v. Lenaburg*, 781 P.2d 432, 437–38 (Utah 1989); *State v. Featherson*, 781 P.2d 424, 427–28 (Utah 1989); *State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988); *State v. Johnson*, 748 P.2d 1069, 1074–75 (Utah 1987), to an abuse of discretion standard. *See State v. Gotschall*, 782 P.2d 459, 462 (Utah 1989); *State v. Saunders*, 699 P.2d 738, 740 (Utah 1985); *State v. Tanner*, 675 P.2d 539, 546 (Utah 1983).

In *Pena*, we distinguished between review for correctness with respect to pure issues of law; de novo and abuse of discretion review with respect to issues of application of law to the facts; and review for clear error with respect to findings of fact. 869 P.2d at 935–39. As to mixed questions of law and fact, we stated that the degree of discretion accorded a trial court could fall within a broad continuum from little or no discretion to broad discretion, depending on the nature of the policies underlying the governing law and the occurrence of multitudinous factual variations giving rise to many highly subtle differences. *Id.* at 937–38.

For the reasons stated by Dean Wigmore, the prejudice that can flow from admitting evidence of other crimes committed by a defendant can be unusually prejudicial, raising acute concerns of fundamental fairness arising from the real possibility that the defendant will be convicted for his presumed bad character rather than his acts. Consequently, we will examine a trial court's decision under Rule 404(b) with very limited deference, according it a relatively small degree of discretion.[3] We do not examine the

---

**3.** It is difficult, if not impossible, to find any real difference between Chief Justice Zimmerman's statement of the standard of review in his opinion "concurring in part" and the standard set out in the text above. He states that the standard is "abuse of discretion" but recognizes that the trial court must make certain subordinate findings that necessarily limit the trial judge's discretion in ruling on the admissibility of prior crime evidence and therefore narrows the scope of review on appeal. The instant opinion states that the trial judge's ruling is entitled to only limited discretion or deference. It is difficult to see any practical difference between the two formulations.

Justice Russon's dissent seems to suggest that all evidentiary rulings are subject to an "abuse of discretion" standard of review that grants trial judges broad discretion, abuse of which will not be found unless the ruling is "beyond the limits of reasonability." Justice Russon's position is far too broad to be correct. Many evidentiary rulings are subject to a narrower standard of review. Some rulings are reviewed for correctness; some are subject to a limited discretion standard and some to a broad discretion standard. Of course, the attempt to differentiate between degrees of discretion in any meaningful way is impossible because discretion is not quantifiable. Nevertheless, standards stating different degrees of discretion do describe a mind set and

issue de novo, but we will review closely the trial court's justifications when it chooses to admit evidence under 404(b).

■ We also take this opportunity to comment upon the appropriate standard to be applied by the trial court in determining the admissibility of prior crime evidence. In *State v. Johnson,* 748 P.2d 1069, 1075 (Utah 1987), we stated, "To give meaning to the policy embodied in Rule 404(b), evidence of other crimes must be reasonably necessary and *highly probative* of a material issue." Our holding in *State v. Dibello,* 780 P.2d 1221, 1229–30 (Utah 1989), also provides guidance. The issue in that case was whether the trial court erred in admitting color photographs of gruesome wounds on a victim's corpse. The Court stated: "[W]e have held that certain categories of relevant evidence have an unusual propensity to unfairly prejudice, inflame, or mislead the jury. For this reason, evidence falling into these categories is uniquely subject to being used to distort the deliberative process and skew a trial's outcome." *Dibello,* 780 P.2d at 1229. For that reason, the Court held that the proponent of the evidence must show that the potential for unfair prejudice does not "outweigh its probativeness." 780 P.2d at 1229; *cf. State v. Lafferty,* 749 P.2d 1239, 1256–57 (Utah 1988); *State v. Cloud,* 722 P.2d 750, 752–55 (Utah 1986); *State v. Garcia,* 663 P.2d 60, 63 (Utah 1983).

■ The rationale underlying *Dibello* lends support to our conclusion here. Prior crime evidence has inherent and unavoidable inflammatory potential. Hence, the general rule stated in the first sentence of Rule 404(b) is that prior crime evidence is inadmissible unless it has a special relevance to the crime charged by being probative of "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[4] To assure the integrity of the trial process, we hold that evidence of prior crimes is presumed to be inadmissible and that, prior to admitting it, the trial court must find that (1) there is a necessity for the prior crime evidence, (2) it is highly probative of a material issue of the crime charged, and (3) its special probativeness and the necessity for it outweigh its prejudicial effect. As stated above, we will review the trial court's rulings on these issues more closely than ordinary rulings on relevance and with a limited deference.

## III. ADMISSIBILITY OF PRIOR CRIME EVIDENCE

The principle that evidence is not admissible to show a defendant's bad character or propensity to commit criminal acts is a fundamental tenet of American jurisprudence and has been recognized in this Court's opinions for over ninety years. *See, e.g., State v. Emmett,* 839 P.2d 781, 785–86 (Utah 1992); *State v. Featherson,* 781 P.2d 424, 426 (Utah 1989); *State v. Johnson,* 748 P.2d 1069, 1075 (Utah 1987); *State v. Tarafa,* 720 P.2d 1368, 1372 (Utah 1986); *State v. Saunders,* 699 P.2d 738, 741–42 (Utah 1985); *State v. Huggins,* 18 Utah 2d 219, 220–21, 418 P.2d 978, 979 (1966); *State v. Winget,* 6 Utah 2d 243, 244, 310 P.2d 738, 739 (1957); *id.* at 245–47, 310 P.2d at 739–41 (Wade, J., concurring); *State v. Williams,* 36 Utah 273, 277–84, 103 P. 250, 252–54 (1909). The dangers to the fairness and integrity of a trial that can flow from prior crime evidence are:

(1) The over-strong tendency to believe the accused guilty of the charge merely because he is a likely person to do such acts;

(2) the tendency to condemn not because the accused is believed guilty of the present charge but because he has escaped unpunished from other offenses; (both (1)

---

influence appellate approaches to reviewing particular issues. Certainly, appellate court review of rulings on such different issues as general relevance, the best evidence rule, hearsay (including the different exceptions to the hearsay rule), privileges (both constitutional and otherwise), and foundation for scientific evidence may vary from review for correctness to the broad abuse of discretion. It is simply not correct to say that all evidentiary rulings are subject to a single broad abuse of discretion standard.

**4.** These categories are not exclusive. Prior crime evidence may be used if specially relevant to any material element of the crime charged. *State v. Tanner,* 675 P.2d 539, 546–47 (Utah 1983); *State v. Forsyth,* 641 P.2d 1172, 1175 (Utah 1982).

and (2) represent the principle of undue prejudice;)

(3) the injustice of attacking one necessarily unprepared to demonstrate that the attacking evidence is fabricated (this represents the principle of unfair surprise).

John H. Wigmore, *Wigmore on Evidence* § 58.2, at 1215 (Tillers rev.1983) (cross-references omitted). To avoid, or at least to mitigate, these dangers, the rules of evidence proscribe the use of prior crime evidence as circumstantial evidence except in narrow circumstances.

Rule 404(b) states:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Thus, although recidivism is characteristic of many types of criminals, especially with respect to certain kinds of crimes, Rule 404(b) flatly prohibits evidence of prior crimes or wrongs to prove the character of a person in order to "show action in conformity therewith." Nevertheless, such evidence may be used "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." But even if relevant to prove such issues, the prior crime evidence must meet certain standards. First, it must be necessary; it cannot be used to prove a point not really contested. Second, it must be strongly probative of a material issue, a probativeness that cannot serve as a ruse for showing that the defendant's propensity is such that he is likely to have committed the kind of crime charged.

■ The trial court justified the admission of Doporto's other crimes under Rule 404(b) as "probative of intent, opportunity, plan, or motive." We disagree. B.J.L.'s and T.M.'s testimony had no probative value beyond the prohibited inference that Doporto had some propensity to commit such crimes and acted in accordance with that propensity.

B.J.L.'s and T.M.'s testimony was not probative of Doporto's intent or motive for sodomizing A.W. Nor was the testimony of B.J.L. and T.M. probative of his opportunity to commit the crime charged. It was uncontroverted that A.W. had slept over at Doporto's house and had been to his house on a number of occasions. Hence, evidence on opportunity was wholly unnecessary because that fact was admitted.

■ As to the trial court's reliance on the "common scheme or plan" exception, there was no evidence of any common scheme or plan beyond what is common to virtually all acts of molestation. Some similarity between prior behavior and the crime charged is "common to many assault and rape cases and is not peculiarly distinctive of [a] defendant's conduct." *Featherson*, 781 P.2d at 428. A loose relevance of prior bad acts to a crime charged based on unremarkable similarities of conduct is not sufficiently probative to justify its admission. Here, the State and the trial court " '[fell] into the common error of equating acts and circumstances which are merely similar in nature with the more narrow common scheme or plan.' " *Id.* at 429 (quoting *State v. Harris*, 36 Wash.App. 746, 677 P.2d 202, 205 (1984)).

Furthermore, the features of the prior crime evidence relied on by the State did not tend to show that Doporto pursued an unusual or unique modus operandi in the prior incidents and the crime charged. Indeed, there was nothing about the particular incident for which Doporto was on trial that showed an unusual or unique modus operandi. The trial court asserted that the prior instances of molestation were "similar to each other in that they involve[d] fondling or intercourse and occurred while at a party at the grandmother's or at Defendant's home while they were visiting one of Defendant's children." But "fondling" and "intercourse" are common to many sex crimes. *See Featherson*, 781 P.2d at 428–29. Furthermore, the fact that the assaults occurred at Doporto's home or the home of a close family relative has little probative value. The crime charged and the prior crimes occurred in places where such crimes frequently occur. In addition, the court's reliance on that point

is misplaced because B.J.L. testified that Doporto took her from his home to a secluded spot in the mountains.

The only element of the evidence of other crimes that even remotely tended to show a unique plan or modus operandi was T.M.'s testimony that Doporto had used baby oil on her. A.W. also stated that he had rubbed "baby lotion" on her thighs sometime prior to sodomizing her. That is not so uncommon, however, as to show a unique modus operandi endowing the testimony with special relevance.

There are some features of the prior crimes and the crime charged against Doporto that are common, but those features are also common to many child abuse cases and have no particular probative value with respect to the elements of the crime charged. The dissent argues that in each instance, Doporto "abused his position of authority as an adult and a parent to commit sexual acts with a child." That, of course, is correct; but it is also correct as to virtually every child abuse case that is prosecuted. The dissent further argues that taking advantage of his position of power as an adult to commit the sex acts shows a "common motive and opportunity." However, motive and opportunity were not contested. Moreover, there was nothing in Doporto's motive, opportunity, or modus operandi that stamped his signature on them in such a way as to distinguish them from many child abuse cases. In short, the real weight of the prior crime evidence went to showing a propensity to commit acts of child abuse rather than to showing that Doporto committed the act charged.

Furthermore, there were significant dissimilarities. A.W. did not claim that Doporto had either threatened her or attempted to bribe her—a factor in all the other incidents. In addition, the manner in which the prior asserted assaults were carried out varied significantly from A.W.'s case. B.J.L. was taken to a remote location, and neither B.J.L. nor T.M. claimed that Doporto attempted anal intercourse on them. The evidence of prior molestations showed, at most, that Doporto had perpetrated different acts of abuse, in various locations, involving girls of differ-

ent levels of physical maturity, some of whom were threatened or bribed, and some, but not all, of whom were related to him. Moreover, all those acts were remote in time, having occurred in 1980 and 1986, some thirteen and seven years prior to trial.

This case is similar to a case correctly decided—we believe—by the Court of Appeals. In *State v. Cox*, 787 P.2d 4 (Utah.Ct. App.1990), the defendant was charged with rape. Two women other than the victim testified that the defendant had raped them two years prior to the charged crime. *Id.* at 6. The prosecution argued that the following similarities between the crimes and the crime charged justified the admission of the prior crime evidence:

(1) [D]efendant knew each victim;

(2) defendant had nonconsensual intercourse, at each victim's home, while the victims' boyfriends or husbands were not home;

(3) defendant was uninvited and began the assaults soon after entering the home;

(4) defendant [lay] on top of the victims;

(5) defendant did not completely remove his clothing or the victims' clothing, and in each instance, attempted to kiss the victim on the face and neck; and

(6) defendant left the premises after completing the assault.

*Id.*

Relying on our opinion in *Featherson*, 781 P.2d at 428, the Court of Appeals held that the evidence of prior crimes did not show a common design or modus operandi by the defendant because the similarities between the prior acts and the crime charged were common to many assault or rape cases and were not, therefore, "peculiarly distinctive of defendant's conduct." *Cox*, 787 P.2d at 6. Likewise, the allegations of similar modus operandi in Doporto's case are common to many child molestation cases and are not "peculiarly distinctive of defendant's conduct." *Featherson*, 781 P.2d at 428. Therefore, because the evidence presented by the collateral witnesses of other crimes was not probative of any material fact at trial, the trial court erred in admitting that evidence.

█ Doporto's trial was potentially compromised on each of these grounds. In addition, the prosecution's closing argument to the jury specifically invited the jury to make the inference of criminal propensity that Rule 404(b) prohibits. The prosecutor argued that Doporto was more likely to have committed the crime charged because of his propensity toward such behavior. In opening argument, the prosecutor asserted:

I think their [i.e., the two prior crime witnesses'] testimony will show that there's a pattern of abusive predator conduct being perpetrated—that was perpetrated by Mr. Doporto during that period. And that will lend credence, I believe, to the testimony that [A.W.] gives you, that this was not one isolated incident with her.

Then in closing argument, the prosecutor again made the same improper argument:

Is this an isolated incident that can just be explained away? I submit to you, [gentlemen], that what we have here is a trail of tears of little kids. It is not just [A.W.] that's been victimized by this man. It's [B.J.L.] [who's] been victimized....

....

And [T.M.], same type of situation. Little niece of Mr. Doporto. He has the opportunity to take advantage of her and does so on two occasions. Latter one in 1989, Labor Day, I believe it was.

....

He realized that he could do something to her because that wasn't the first time; [he had molested her previously] back in the July of 1980 when the family was visiting.

Thus, the State argued that because Doporto had allegedly committed other sexual crimes, he was more likely to have committed the crime charged. Given these arguments, the jury could well have concluded that even if Doporto was not guilty of sexually molesting A.W., he should not escape unpunished for the "trail of tears" he had created.

Moreover, the trial court's ruling allowing the State to choose any two witnesses as to

prior misconduct without giving notice to defendant magnified the unfairness of the proceeding. Any defenses that Doporto might have prepared within the four days between the ruling on the State's motion in limine and the trial would have had to account for all four witnesses, involving five separate incidents.[5]

Even Doporto, unfamiliar as he was with the rules of procedure and evidence, recognized the unfairness of this dilemma. When the State called B.J.L. to the stand and she related her story, Doporto objected:

MR. DOPORTO: Objection.

THE COURT: All Right. What is your objection, Mr. Doporto?

MR. DOPORTO: We are talking about [A.W.] in this case—not [B.J.L.'s] case, am I correct?

THE COURT: Well, you're correct in that this—what's claimed the victim was [A.W.] in this case, yes.

MR. DOPORTO: Then why [are] we having a trial for [B.J.L.]?

Finally, even if the prior crime evidence had some minor probative value, the trial court's ruling under Utah Rule of Evidence 403 that the prejudicial effect of the evidence did not substantially outweigh its probative value was also incorrect. As already noted, the prejudicial quality of the prior crime evidence was severe and readily apparent, and that prejudice was magnified and seriously exacerbated by the prosecutor's closing argument that defendant was likely to have committed the crime charged because he had committed prior crimes of the same type. The unavoidable conclusion is that the prejudicial nature of the prior crime evidence far outweighed its legitimate probative value, if any, that it had.

█ That conclusion does not by itself, however, require a reversal. A conviction will not be reversed even if there is error unless the error is "prejudicial in the sense that there is a reasonable likelihood that in its absence there would have been a more

---

5. The record does not indicate when Doporto was in fact notified which witnesses would testify. Even if the State had notified Doporto immediately of the witnesses it selected to testify to his alleged prior acts, that still would have left him very little time to mount an adequate defense.

favorable result for the defendant." *State v. Johnson,* 771 P.2d 1071, 1073 (Utah 1989).

 The jury had to assess Doporto's and A.W.'s credibility and decide whether it believed beyond a reasonable doubt that the victim was telling the truth. The jury could have concluded that she was telling the truth without the prior crime evidence, but we are wholly unable to conclude that the jury was uninfluenced by that evidence in assessing defendant's and the victim's credibility. We cannot say with any assurance that absent the erroneous admission of the evidence of the prior crime evidence, the result would have been the same.

The dissent places heavy reliance on "corroborating evidence" that it asserts renders any error harmless. The dissent argues specifically that the stain in the victim's panties, which it assumes was blood (but which may not have been, and if it were, may have been caused by a bowel movement), and the victim's behavioral changes that, while consistent with sexual abuse (but also with other causes), show that any error was sufficiently inconsequential to permit no reasonable likelihood of a different outcome. At best, this evidence may have some corroborating value, but by itself, or even in conjunction with A.W.'s testimony, it is far from compelling[6] and is not sufficient to render harmless the highly inflammatory testimony given by B.J.L. and T.M.

In sum, the prior crime evidence was a central part of the prosecution's case, and the prosecutor chose to argue to the jury the very inferences that the law explicitly forbids, quite apart from its relevance. Even if there were special probative value of the evidence beyond mere relevance that outweighed the prejudicial value of the evidence, the prosecutor's argument would still have been erroneous and prejudicial. In sum, the

admission of the prior crime evidence and the prosecutor's arguments based thereon constituted prejudicial error and require a reversal and remand for a new trial.

## IV. OTHER ISSUES ON APPEAL

Doporto also asserts that the trial court committed a number of other errors by (1) finding him not indigent and thereby depriving him of his right to counsel; (2) depriving him of due process by failing to allow or provide him a "human interpreter" to compensate for his hearing deficiency; (3) failing adequately to admonish him of his right to be tried by a jury of eight persons; (4) allowing prosecutorial misconduct; (5) admitting "profile" evidence of victims of child abuse; (6) providing an inadequate record on appeal; and (7) permitting the jury panel to be tainted by prejudice. Most of these claims of error are either patently without merit or are not likely to recur on a retrial; however, a few require some comment to avoid errors on remand.

 Defendant contends that the trial court erred in finding him not indigent and therefore not entitled to appointed counsel. The trial court found that his monthly household income exceeded his monthly household expenses by $1,191 to $1,641 for the relevant period. The court found that defendant was not indigent and had the resources on a "practicable basis" to employ private counsel without undue hardship on his ability to provide the necessities of life for himself and his family. Under the rule in *State v. Vincent,* 883 P.2d 278, 283–85 (Utah 1994), the trial court did not err.

 Doporto also argues that the electronic headphones provided him were an inadequate means for overcoming his partial hearing impairment and did not allow him to

---

**6.** A physician called by the State to comment upon the source of the purported bloodstain in A.W.'s panties stated that bleeding from a tear in the rectum could be caused by an act of sodomy but was also commonly caused by "a simple tear from a bowel movement." The physician also stated that given a substantial delay of time, a physical examination could not pinpoint the precise cause of such bleeding. Moreover, the aunt who discovered the stain in the panties (and also

noticed that A.W. was experiencing unusual discomfort) did not specifically link the date of these discoveries to the time when A.W. spent the night at Doporto's home, did not take A.W. to a physician, and threw the panties away. The only evidence that what she had discovered was in fact blood was her description of it as a dark stain that had no odor. The probativeness of that evidence was ambiguous at best.

hear and participate meaningfully in the proceedings against him. Certainly, failure to provide adequate hearing assistance would be equivalent to trying Doporto in absentia. The unfortunate part of hearing loss is that a hearing-impaired person may not know what he does not hear. We see no reason why Doporto's wife should not be allowed to assist him at trial, even if he has headphones, to assure his complete awareness of the words spoken and by whom, especially when other people fail to speak into the microphone. The serious nature of the proceedings against him requires no less.

■ Doporto also complains about particular comments made by the prosecutor during the trial relating to his decision to represent himself and his failure to qualify as an indigent. It is unclear what degree of prejudice these comments engendered. It seems unlikely that they tainted the proceedings to any great degree. Nevertheless, we agree that such comments were irrelevant and inappropriate. The State should avoid drawing attention to these matters on retrial.

■ Finally, Doporto argues that the trial court permitted presentation of inadmissible evidence of the "profile" of a typical sexual molestation victim in violation of our ruling in *State v. Rimmasch*, 775 P.2d 388 (Utah 1989). *Rimmasch* held that expert opinion is inadmissible to show, on the basis of a child sexual abuse "profile," that a victim has in fact been abused. However, no profile evidence was offered in this case. *Id.* at 407. Moreover, *State v. Kallin*, 877 P.2d 138 (Utah 1994), held that an expert witness may testify that a "victim's behavior was consistent with symptoms that might be exhibited by one who had been sexually abused," as long as the expert does not "testify to any kind of sexual abuse profile as such, [or that] the symptoms manifested by the victim demonstrated that [the victim] had been sexually abused." *Id.* at 141. In this case, Dr. Ravesten testified as to the nature of behavior frequently exhibited by child sexual abuse

victims. He stated that children typically do not report abuse until a number of years after it has occurred. He also briefly related some common behavioral changes in children who are sexually abused, particularly guilt, isolation, and poor performance and disruptive behavior in school. Some of these factors were consistent with the behavior A.W. exhibited after the summer of 1988, but Dr. Ravesten made no comment about that fact on direct examination.[7] His testimony thus fell within the permissible bounds of *Kallin*.

Reversed and remanded for a new trial.

DURHAM, J., concurs.

HOWE, J., concurs in the result.

ZIMMERMAN, Chief Justice, concurring in part:

I concur with the majority opinion except as to its discussion in part IV whether the trial court erred in depriving Doporto of an interpreter to compensate for his hearing deficiency. I also write to clarify the discussion of our prior case law in part II regarding particular categories of potentially prejudicial evidence, the application of that case law to prior crime evidence, and the standard of review for the admissibility of trial court rulings on such evidence.

Regarding the interpreter question, I am of the view that this issue was not adequately briefed by the parties and is not necessary to the resolution of this case. Accordingly, I express no opinion as to how it should be resolved.

On the evidentiary question, I also write separately to distance myself from some statements made by Justice Stewart in part II of his opinion. There, he suggests that the standard of review we should apply to a 404(b) determination by a trial court regarding the admission of "other crimes" evidence is one that accords "limited deference" to the trial judge. I cannot agree with that charac-

---

7. On cross-examination, Dr. Ravesten did specifically discuss A.W.'s case. In an apparent attempt to elicit testimony favorable to himself, Doporto asked if a child who had been sexually abused would "go back to the scene of the crime again and again and again." This was obviously a direct reference to A.W., and Dr. Ravesten responded by discussing A.W.'s motives for maintaining her friendship with Doporto's daughter and her willingness to return to Doporto's home after the crime, even though Doporto was present.

terization of our prior case law. I think "abuse of discretion" is still the appropriate standard of review. However, my difference with Justice Stewart in his articulation of the standard probably would not materially change how each of us would review a trial court decision to admit the evidence here. The reason for this similar outcome is that under the standard we articulated in *Dibello*, and the cases upon which it relied, where evidence falls into the category of being presumptively unfairly prejudicial, as does prior crime evidence, we have shifted the burden on admissibility. The presumption is against the admission of such evidence under rule 403. Justice Stewart rightly finds that presumption consistent with rule 404. Having shifted the presumption of unfair prejudice against prior crime evidence sought to be admitted under rule 404(b), a heavy burden is placed on the proponents of the evidence, and the trial court must make fairly specific findings to show that the burden has been met. On appeal, I would characterize the standard of review as abuse of discretion, as it is in other instances of the admission of evidence. However, because *Dibello* and its predecessors, and today's decision in the area of prior crime evidence, have erected such high barriers to the admission of evidence which we consider presumptively prejudicial, in order to avoid the conclusion that the trial court abused its discretion in admitting such evidence, all "i"s must be dotted and all "t"s crossed. Operatively, this may produce the same result as Justice Stewart's articulation of a tighter standard of review. However, I think there is a fundamental and important difference.

Under the *Dibello* line of cases, we make it clear that while as a matter of law, certain categories of evidence are presumptively unfairly prejudicial, the trial judge is the one primarily responsible for making the evaluation of whether the proponent of the evidence has overcome that presumption. Under Justice Stewart's articulation, the relative importance of the trial court's judgment about those factors seems diminished and the appellate court's enhanced. I cannot agree with this articulation because although the difference is subtle, and may not often produce a different outcome, I find Justice Stew-

art's articulation to be premised on what I conclude is a view of the appellate court's primacy that is inconsistent with our prior case law and with the appropriate allocation of responsibility between trial and appellate courts.

RUSSON, Justice, dissenting:

I respectfully dissent. I cannot agree with the majority that the trial court erred in admitting the testimony of the other two girls in this case. Not only was this evidence admissible under rule 404(b) of the Utah Rules of Evidence, but its probative value outweighed its prejudicial effect under rule 403.

The trial court's rulings on the admissibility of evidence are reviewed under an "abuse of discretion" standard. *State v. Hamilton*, 827 P.2d 232, 239 (Utah 1992). Under this standard, we will not find an abuse of discretion unless the trial court's determination was "beyond the limits of reasonability." *Id.* at 240. However, today the majority enunciates a new standard, one which for all intents and purposes eliminates the trial court's discretion and substitutes this court's judgment as to the admissibility of evidence under rule 404(b).

Reviewing a trial court's 404(b) determinations under such a nondiscretionary standard of review contravenes important policy considerations which underscore the need for a trial court's broad discretion in evidentiary rulings. We have recently affirmed the trial court's discretion under rule 403 relevancy determinations. *Harline v. Barker*, 912 P.2d 433, 441 (Utah 1996); *State v. Troyer*, 910 P.2d 1182, 1191 (Utah 1995); *State v. Pena*, 869 P.2d 932, 938 (Utah 1994). Rule 403 involves a similar balancing test to that employed by the trial court in a rule 404(b) determination. Under both rule 404(b) and rule 403, the trial court must weigh the appropriate factors and determine whether the probative value of the evidence is outweighed by the potential for prejudice. The trial court is in a better position than the appellate court to make such a determination. "The decision of the trial judge is accorded great deference because his firsthand expo-

sure to all the evidence and his familiarity with the course of the trial proceedings are the best qualifications available for evaluating the value of the evidence in its proper context." 29 Am.Jur.2d *Evidence* § 462 (1994) (footnote omitted) (discussing Fed. R.Evid. 404(b)).

However, under the standard adopted by the majority, the trial court's evidentiary determination based upon its familiarity with the proceedings and scope of the evidence will no longer be granted an appropriate amount of deference, but, rather, the majority insists that this court should make determinations as to the admissibility of evidence under rule 404(b) based only upon the record before it. Appellate judges relying only on a written record are seldom in as good of a position as a trial judge in determining the admissibility of evidence. This is why trial judges have been afforded discretion in this area.

Furthermore, the majority mischaracterizes the plain language of rule 404(b). The majority states, "[T]he general rule stated in the first sentence of Rule 404(b) is that prior crime evidence is inadmissible unless it has a special relevance to the crime charged by being probative of 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" However, the first sentence of rule 404(b) actually states, "Evidence of other crimes, wrongs or acts is not admissible to prove the *character* of a person in order to show action in conformity therewith." (Emphasis added.) The rule continues: "*It may, however, be admissible for other purposes,* such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or identity." (Emphasis added.) I do not quarrel with the rule's presumption of inadmissibility of other crimes' evidence with respect to proving character. However, the rule plainly provides that, for other purposes, including plan or opportunity, such evidence may be admissible. Just how many friends would have to be molested while visiting this man's daughter before the majority would be convinced that evidence of such abuse may be relevant to prove design or opportunity?

Finally, rather than applying its new rule to evidence of past sexual abuse of a child, which is at issue in this case, the majority takes the opportunity to apply its new, non-deferential standard to *all evidence* falling under the "other crimes" category. I cannot agree with the imposition of a new, nondeferential standard on such a broad category of evidence as that encompassed by the consideration of "other crimes" evidence under rule 404(b). In this case, we should be considering whether the trial court abused its discretion in admitting the evidence in question.

I would hold that the trial court did not abuse its discretion in determining that the similarities between the incidents involving B.J.L. and T.M. and the incident involving A.W. were sufficient to render testimony relating to the other incidents admissible under rule 404(b) to show opportunity or motive. *Accord State v. Tecca,* 220 Mont. 168, 714 P.2d 136, 138 (1986) ("While the prior acts were not identical to the offense committed in this case, there is sufficient similarity to sustain admission."). In each of the instances testified to, as well as in A.W.'s case, Doporto abused his position of authority as an adult and a parent to commit sexual acts with a child. Each incident involved sexual abuse on a young female victim with whom Doporto's contact arose out of a social event with the Doporto family. In both the incidents testified to by B.J.L. and the incident attested to by A.W., Doporto had come into contact with the victim when the victim came to visit one of Doporto's daughters at Doporto's home. Likewise, the incidents attested to by T.M. occurred when Doporto came into contact with T.M. at a Doporto family gathering. Thus, in each incident, Doporto's presence as an adult and a parent put him in a position of authority with respect to the girls, and in each incident, Doporto took advantage of his position to commit sexual acts with them. These facts clearly point to a common motive and opportunity, and it cannot be said that the trial court abused its discretion in so concluding.

Moreover, the testimony of B.J.L. and T.M. was relevant to prove Doporto's identity as the perpetrator of the crime against A.W. Although the trial court did not state that the

two girls' testimony was relevant to show identity, we may affirm on any available ground. *White v. Deseelhorst,* 879 P.2d 1371, 1376 (Utah 1994). Other than A.W.'s own uncontroverted testimony, the State presented evidence showing that A.W. was sexually abused but did not provide any eyewitness testimony. The testimony of the two girls that they were sexually abused under similar circumstances by Doporto served to corroborate A.W.'s testimony and, accordingly, was clearly relevant and admissible to show identity.

In addition, the probative value of the two girls' testimony was not outweighed by the prejudice to Doporto under rule 403. In *State v. Shickles,* 760 P.2d 291 (Utah 1988), this court adopted several factors to assist a trial court in weighing the evidence under rule 403. These factors include

> "the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility."

*Id.* at 295–96 (quoting E. Cleary, *McCormick on Evidence* § 190, at 565 (3d ed. 1984)). First, as discussed above, the incidents testified to by B.J.L. and T.M. were sufficiently similar to the incident attested to by A.W. to support their admissibility. Second, two of the three incidents attested to by the other girls occurred within one and two years of the incident attested to by A.W. Third, the other girls' testimony was necessary to corroborate A.W.'s testimony, as the State provided no eyewitnesses. Therefore, I would hold that the trial court did not abuse its discretion in admitting the testimony of B.J.L. and T.M. under rule 403.

Even if the trial court did err in admitting the two girls' testimony under rule 403, this error will not result in reversal unless the error is harmful. *See Hamilton,* 827 P.2d at 240. "In order to constitute reversible error, the error complained of must be sufficiently prejudicial that there is a reasonable likelihood of a more favorable result for the defendant in its absence." *State v. Featherson,* 781 P.2d 424, 431 (Utah 1989).

Viewing the evidence in a light most favorable to the jury's verdict, it cannot be said that the trial court's admission of the girls' testimony under rule 403, even if error, was such that it undermined the verdict. The State presented strong direct and circumstantial evidence of the crime committed upon A.W. A.W.'s testimony that she was sexually abused by Doporto was uncontroverted. Further, the jury was presented with evidence that A.W. had, in fact, been sexually abused. A.W.'s aunt testified that subsequent to the alleged incident, she discovered a black stain covering the crotch of A.W.'s panties and that when A.W. got into the bath, it hurt for her to sit in the water. An expert for the State testified that a child who was anally raped by an adult would likely experience a rectal tear, that the tear would bleed, that dried blood could look black, and that the tear would be very painful. A.W.'s mother testified that A.W.'s behavior changed shortly after the alleged incident: A.W. experienced difficulty in school, wanted to change her name and appearance, and withdrew from adults, particularly men. In short, the State provided ample evidence outside of the testimony of the two other girls such that there is no reasonable likelihood that the results would have been more favorable to Doporto without that testimony.

Therefore, I would conclude that the trial court did not abuse its discretion in admitting the testimony of the other two victims, and in any case, the admission of such evidence did not undermine the jury verdict because of the overwhelming evidence to support it.